UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| Darryl Cheeks, | ) | No. 10 B 27605 |
| Debtor. | ) | |
| —————————————————— | ) | |
| | ) | |
| Mark Hulbert, Sr., | ) | |
| | ) | No. 10 A 01934 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Darryl Cheeks, | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this Adversary proceeding, trial was held on Plaintiff's action to bar discharge of debts assertedly owed him by Defendant. Having considered stipulations of the parties, the evidence received at trial, and the arguments of counsel, the following Findings of Fact and Conclusions of law are made and entered. Pursuant thereto, judgment is separately entered in favor of Defendant.

## INTRODUCTION

This Adversary Proceeding relates to a voluntary Chapter 7 bankruptcy case filed by Darryl Cheeks ("Defendant" or "Cheeks"). Mark Hulbert ("Plaintiff" or "Hulbert") filed his Adversary Complaint herein seeking determination, in one count, that his claims against Defendant are not dischargeable under 11 U.S.C. § 523(a)(2)(A) because Defendant allegedly misrepresented facts and committed fraud.

Plaintiff owned 40% of Chicagoland Foods Military Consortium ("CFMC") and served as its secretary and a director. Defendant was the president and treasurer of CFMC and owned 60% of CFMC. There was a Shareholder's Agreement between Hulbert and Cheeks relating to CFMC. Defendant also owned other companies including Taylor Cheeks & Associates, Black Rhino, The Shire Group, Chicagoland Barbecue, Inc. ("CBI") and DKL d/b/a "Blues." Plaintiff

contended that Defendant promised that CFMC's business profits would be divided equally between them, but that Plaintiff never received his share of profits.

Post-trial, Plaintiff also argued that the debt owed him is non-dischargeable under 11 U.S.C. § 523(a)(4) because Defendant misappropriated assets of CFMC, thereby establishing Defendant's defalcation while acting in a fiduciary capacity. (Pl.'s Proposed Findings ¶ 28) Plaintiff further argued that Defendant embezzled funds owing to him personally. (*Id.*)

Plaintiff obtained judgment against Defendant in District Court for the amount of $225,000 in damages and $53,730 in attorney's fees and costs. (Pl.'s Ex. 57) However that judgment was by default, and no Findings of Fact or Conclusions of Law were made or entered.

## JURISDICTION

Jurisdiction lies under 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b).

## FINDINGS OF FACT

### Chicagoland Foods Military Consortium

1.  Chicagoland Foods Military Consortium, Inc. was an Illinois corporation formed in 2003. (Stip. ¶ 3; Pl.'s Ex. 12)

2.  Cheeks was president of CFMC from its formation to its dissolution. (Testimony of D. Cheeks)

3.  At all times, CFMC's corporate office was maintained at 1480 Renaissance Drive, Park Ridge, Illinois. (Stip. ¶ 5; Testimony of M. Hulbert)

4.  CFMC was dissolved in 2009. (*Id.* ¶ 6; Testimony of D. Cheeks; M. Hulbert)

5.  The initial owners of CFMC stock were Cheeks and Hulbert. Cheeks owned 600,000 Class A voting shares or 60% of CFMC issued stock and Hulbert owned 400,000 or 40% of CFMC Class A shares. (Stip. ¶ 15, 19; Pl.'s Ex. 13)The Class A voting shares were the only voting shares in CFMC that were issued. (Pl.'s Ex. 13)

6.  There was a shareholders agreement between Cheeks, Hulbert, and CFMC executed on July 5, 2003. (Pl.'s Ex. 13) In his testimony, Hulbert could remember only what he recalls as a personal guarantee from Cheeks. He could not remember other provisions in the agreement. (Testimony of M. Hulbert) That agreement was introduced into evidence. (Pl.'s Ex. 13)

7. Cheeks was the president, treasurer, and a director of CFMC. (Stip. ¶ 14)

8. Hulbert was the secretary and also a director of CFMC. (*Id.* at ¶ 15) Since the time CFMC was formed and continuing until at least September, 2006, Hulbert worked for CFMC as its primary sales and marketing director of CFMC products. (Testimony of M. Hulbert)

9. At trial, it was disputed whether CFMC ever had properly installed board members. (Testimony of C. Cheeks; M. Hulbert; C. Cheeks; K. Erickson)

### The "Legal Agreement" Between CFMC and CBI

10. On January 1, 2003, Cheeks signed a "Legal Agreement" in which CFMC incurred $750,000 of debt. (Stip. ¶ 29; Testimony of D. Cheeks; Pl.'s Ex. 2) Pursuant to that agreement, CBI agreed to sell accounts it held with branches of the U.S. military to CFMC in exchange for a promisorry note. (Pl.'s Ex. 2) This document was signed by Cheeks in his capacity as "President & CEO, The Chicagoland Companies." (*Id.*) Conflicting testimony was presented as to whether this sale was authorized by CFMC board members. (Testimony of C. Cheeks; D. Cheeks; M. Dice; M. English; M. Hulbert) Payment were made from CFMC to CBI pursuant to the Legal Agreement. (Stip. ¶ 31; Pl.'s Ex. 66)

### Deferred Compensation Trust

11. Cheeks established a "Deferred Compensation Trust" account with Anthony James Asset Management in the names of Plaintiff and Defendant. (Stip. ¶¶ 34, 36; Pl.'s Ex. __)

12. Cheeks caused $200,000 to be transferred from CFMC to Anthony James Asset Management as Trustee to fund that account. (Stip. ¶ 35; Pl.'s Ex. 15)

13. Between October 2006 and December 2006, the account was liquidated. (Stip. ¶ 38; Pl.'s Ex. 19)

### Other Entities Owned or Controlled by Defendant

14. Chicagoland Barbecue, Inc. ("CBI") was an Illinois corporation with its principal place of business located at 1480 Renaissance Drive, Park Ridge, Illinois. Cheeks was the president, treasurer, and a director of CBI. (Testimony of D. Cheeks; M. Hulbert) CFMC's books and records, including all of its checking account records and bank account records, were maintained at 1480 Renaissance Drive, Park Ridge, Illinois. (Stip.

¶ 18) Defendant also separately owned other companies including: Taylor Cheeks & Associates; Black Rhino; DKL d/b/a "Blues;" and the Shire Group. (Stip. ¶ 22)

15. Taylor Cheeks & Associates was an Illinois accounting firm, of which Cheeks was a partner. (*Id.* at ¶ 23) Black Rhino is an Illinois accounting firm owned by Cheeks formed after Taylor Cheeks & Associates dissolved. (*Id.* at ¶ 24) Cheeks and his accounting firms acted as CFMC's accountant for purposes of preparing and filing federal tax returns of CFMC but not for preparing audits. (*Id.* at ¶ 16)

16. DKL d/b/a Blues, The Shire Group, Black Rhino CFMC, and CBI all maintained office space at 1480 Renaissance Drive, Park Ridge, Illinois. (Stip. ¶ 27–28; Testimony of D. Cheeks)

**Use of CFMC Assets**

17. Assets of CFMC were used to pay the expenses of other companies owned or controlled by the Defendant. (Pl.'s Ex. 1)  CFMC paid to Renaissance Northwest Highway, LLC rent for office space leased at 1480 Renaissance Drive and  also used by Black Rhino, DKL d/b/a Blues, The Shire Group, and Houston-Rogers Consulting. (Testimony of D. Cheeks; Pl.'s Ex. 39–41, 71)  CFMC paid re:Genesis Corp. for computer hardware, software, and technical support services provided to Black Rhino, DKL d/b/a Blues, The Shire Group, and Houston-Rogers Consulting. (Pl.'s Ex. 36–38, 71) CFMC paid Five Point Capital Leasing for financing charges from the purchase of office furniture used by Black Rhino, DKL d/b/a Blues, The Shire Group, and Houston-Rogers Consulting. (Testimony of D. Cheeks; Pl.'s Ex. 44, 71) CFMC paid Avaya Financial Services for the financing of telephone equipment used by Black Rhino, DKL d/b/a Blues, The Shire Group, and Houston-Rogers Consulting. (Testimony of D. Cheeks; Pl.'s Ex. 42, 71) Cheeks testified that all of these expenses were paid proportionately by each entity (but evidence of this was not supplied). (Testimony of D. Cheeks) Plaintiff's expert witness, John Shoults, testified that he could find no records of an apportioning agreement or that expenses were otherwise apportioned. (Testimony of J. Shoults)

**District Court Litigation**

18. On October 24, 2006, Hulbert requested that Cheeks produce the corporate records of CFMC and CBI. (Stip. ¶ 39; Testimony of M. Hulbert; Pl.'s Ex. 22)

19. On January 23, 2007, Hulbert filed a lawsuit captioned *Mark Hulbert, Sr. v. Darryl Cheeks and Chicagoland Foods Military Consortium* in the United States District Court for the Northern District of Illinois, case number 07CV0423. (Stip. ¶ 33; Pl.'s Ex. )

20. On July 23, 2010, District Judge Milton I. Shadur entered a default Judgment Order against Defendant and in favor of Plaintiff for the total amount of $279,430. (Pl.'s Ex. 57; Testimony of M. Hulbert)

**Additional Facts**

21. Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

The Complaint here was amended by post-trial motion whereby pleadings were amended to conform with proof at trial under Fed. R. Bankr. P. 7015. (AP Dkt. No. 103) As thus amended it seeks to bar discharge under 11 U.S.C. § 523(a)(2)(A) of a debt allegedly owed to Plaintiff by Defendant. Section 523(a)(2)(A) excepts from discharge any debt: "For money, property, services . . . to the extent obtained , by – false pretenses, a false representation, or actual fraud . . . ." Plaintiff also seeks to bar dischargeability under 11 U.S.C. § 523(a)(4), which prevents discharge of a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." Plaintiff's additional mention of 11 U.S.C. § 523(a)(2)(B) was not supported by argument or evidence.[1]

**Standards Under Statutes Asserted by Plaintiff.**

False pretenses under 11 U.S.C. § 523(a)(2)(A) include express or implied misrepresentations or conduct intended to create or foster false impression. *Memorial Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996); *ColeMichael Invs., LLC v.*

---

[1] The Complaint and Plaintiff's Proposed Findings of Fact and Conclusions of Law in several places state that Plaintiff seeks relief under 11 U.S.C. § 523(a)(2)(B). That provision excepts from discharge "any debt – for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by – use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive . . . ." Plaintiff has not identified any statement in writing used by the Defendant in creating the debt allegedly owed to him. In addition, Plaintiff did not argue the requirements to bar discharge set forth in § 523(a)(2)(B). Therefore, references to that provision will not be addressed.

*Burke (In re Burke)*, 405 B.R. 626, 645 (Bankr. N.D. Ill. 2009). False pretenses do not necessarily require overt misrepresentations. Instead, omissions or failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression that is known by the debtor. Silence or concealment may constitute false pretenses. *Sarama*, 192 B.R. at 922; *Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 573 (Bankr. C.D. Ill. 2005); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002). To establish a prima facie case of false pretenses or false misrepresentation, a plaintiff must show that: ( 1) the debtor made the representation; (2) at the time of the representation the debtor knew it to be false; (3) the debtor made the representation with the intent and purpose of deceiving the plaintiff; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff sustained a loss or damage to it as a proximate cause of the representation having been made. *Vozella v. Basel-Johnson (In re Basel-Johnson)*, 366 B.R. 831, 845 (Bankr. N.D. Ill. 2007). "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Id.*

A plaintiff may justifiably rely and there is no duty to investigate unless the falsity of the representation is readily apparent. Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard. *Id.* A false representation can be shown through conduct and does not require a spoken or written statement. A debtor's silence regarding a material fact can constitute a false representation under 11 U.S.C. § 523(a)(2)(A). *ColeMichael Invs., LLC v. Burke (In re Burke)*, 405 B.R. 626, 645–46 (Bankr. N.D. Ill. 2009); *Health Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007).

To prevail under 11 U.S.C. § 523(a)(4), the moving party must prove that the debtor committed (1) fraud or defalcation while acting in a fiduciary capacity; or (2) embezzlement; or (3) larceny.

A Seventh Circuit Panel has found that a fiduciary relationship exists for purposes of § 523(a)(4) when there is "a difference in knowledge or power between a fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994); *see also Vozella v. Basel-Johnson (In re Basel-Johnson)*, 366 B.R. 831, 847 (Bankr. N.D. Ill. 2007). The plaintiff must establish the existence of an express

trust or a fiduciary relationship and a debt caused by the debtor-defendant's defalcation while

acting as a fiduciary. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re Woldman*, 92 F.3d

546 (7th Cir. 1996); *Vozella*, 366 B.R. at 848.

Embezzlement is established by showing the defendant appropriated the subject funds for

his own benefit and with fraudulent intent or deceit. *Kaye v. Rose (In re Rose)*, 934 F.2d 901,

903 (7th Cir. 1991); *Vozella*, 366 B.R. at 848. Embezzlement arises where the original taking

was lawful, or at least with the consent of the owner, and the unlawful taking occurs after. *Kaye*,

934 F.2d at 903; *Vozella*, 366 B.R. at 848.

The foregoing standards might apply here to some transfers of CFMC assets if Plaintiff

had shown a personal harm and consequent debt to him from the harm proven. However, he has

not done so. The default judgment in favor of Hulbert did not find and certainly did not establish

any facts in this case because such judgments are not given preclusive effect. Most opinions

follow the view that for issues to be precluded they must have been actually litigated in the prior

proceeding. Otherwise collateral estoppel is not applied to any facts or issues. *In re Jacobs*, 448

B.R. 453 (Bankr. N.D. Ill. 2011) (Sonderby, J.); *In re Nikitas*, 326 B.R. 127 (Bankr. N.D. Ill.

2005) (Goldgar, J.); *Chi. Materials Corp. v. Hildebrandt (In re Hildebrandt)*, 2012 Bankr.

LEXIS 386 (Bankr. N.D. Ill. 2012) (Barbosa, J.). In bankruptcy dischargeability proceedings, a

default judgment is therefore not generally accorded preclusive effect because the issues are not

actually litigated to obtain a default judgment. This general federal rule of issue preclusion is

applied pursuant to reasoning in the United States Supreme Court decision of *Brown v. Felsen*,

442 U.S. 127, 60 L. Ed. 2d 767, 99 S. Ct. 2205 (1979).

A plaintiff must prove elements required to except a debt from discharge under 11 U.S.C.

§ 523 by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Plaintiff asserts that he proved by a preponderance of evidence that his claim should not

be dischargeable under 11 U.S.C. § 523 because Defendant "misappropriated assets of CFMC by

false pretenses." (Pl.'s Proposed Conclusions ¶ 18) Although not specifically identified or

argued by Plaintiff, the purported misrepresentations by Defendant appear to include the

following: "Cheeks represented to Hulbert that the profits from CFMC would be divided on an

equal basis," (Pl.'s Proposed Findings ¶ 32); "Cheeks agreed that all amounts taken from the

company that could be divided on an equal basis would be divided on an equal basis," (Pl.'s

Proposed Findings ¶ 33); and "Cheeks represented to Hulbert that Cheeks was not taking money

from CFMC." (Pl.'s Proposed Findings ¶ 34). Plaintiff has not alleged nor did he establish during trial when these purported representations were made.

Plaintiff further argued that Cheeks, as a certified public accountant, owed him fiduciary duties under Illinois law. (Pl.'s Proposed Conclusions ¶¶ 5, 10) Plaintiff also maintained that Defendant owed CFMC a fiduciary duty as its accountant, president, treasurer, and CFO. (*Id.* at ¶ 4)

The parties have not specified what law applies but "[c]ourts do not worry about conflict of laws unless the parties disagree on which state's law applies." *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991). CFMC was an Illinois corporation formed in 2003. (Stipulated Facts ¶ 3) Cheeks is a citizen and resident of Illinois who maintains his domicile in Illinois. (*Id.* ¶ 2) The "Deferred Compensation Agreement" at issue states that it shall be interpreted in accordance with the laws of the state of Illinois. (P. Ex. 14 ¶ 15) Therefore, Illinois law is deemed to apply here as to state law issues.

## I.    MISHANDLING OF CORPORATE ASSETS

### Plaintiff has Standing to Sue Here.

Because Plaintiff complains about corporate assets taken from CFMC, Defendant has challenged Plaintiff's "standing" to challenge Defendant's discharge because of those takings. (Def.'s Proposed Findings ¶ 4) The Bankruptcy Code identifies who may bring an action to except from discharge certain debts. Under 11 U.S.C. § 523(c), debtors shall be discharged from a debt of the kind specified in paragraph (2) of subsection (a) unless, "on request of the creditor to whom such debt is owed, and after a notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2) . . . ." As discussed more fully below, the taking of corporate assets gave rise to a claim by the corporation, not by its stockholder Hulbert to recover for himself. However, a creditor is any entity with a claim against the debtor or the bankruptcy estate. 11 U.S.C. § 101(10). A claim is a right to payment or, in some instances, a right to an equitable remedy for breach of performance. § 101(5). It is clear that Plaintiff has a claim against Defendant's estate; he obtained a default money judgment against Defendant in the Northern District of Illinois in the amount of $278,730. (Compl. Ex. F) He is, therefore, a creditor of the Debtor so that he may object to the Debtor's discharge.

### But Plaintiff is not a Party-in-Interest Entitled to Recover for Wrongs Against CFMC.

Defendant's attack on Plaintiff's ability to bring this action is more properly characterized as a question of whether Hulbert is the correct party-in-interest to bring this suit. Fed. R. Civ. P. 17(a) (made applicable in bankruptcy by Fed. R. Bankr. P. 7017) requires that "[a]n action must be prosecuted in the name of the real party in interest." This is a question of state law. *Ching v. Porada*, 560 F. Supp. 2d 675, 678 (N.D. Ill. 2008). Under Illinois law, a suit based on harm to a corporation, which was the main charge in this action, must be brought in the corporate name as a derivative action unless an investor has suffered "a distinct personal injury." *Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158, 159 (7th Cir. 1996). Examples of distinct personal injuries to shareholders recognized by Illinois courts included a shareholder who alleged that corporate board members refused to return stock pledged to secure a debt after the loan was repaid and a shareholder-employee who challenged his dismissal from employment. *Id.* at 160–61 (citing cases). Illinois law requires that a court determine as a preliminary matter the "gravamen" of the pleadings to determine if the injury alleged is to the plaintiff individually or to the shareholders as a whole. *Poliquin v. Sapp*, 390 N.E.2d 974, 977 (Ill. App. 1979). Plaintiff here attempted to show several instances of personal injury suffered by him as a consequence of Defendant's conduct, but that proof showed only harms to the corporation.

Treating the corporation as owner of the claim under law has an important procedural consequence. *Id.* at 159. Before bringing a derivative suit as a stockholder, a stockholder would ordinarily be obliged to notify the corporate board and demand that the company bring the suit in its own name. *See id.* Only if CFMC refused or such demand could be said to be futile could Hulbert litigate by derivative suit for damage inflicted on the corporation by Cheeks. *See id.* But lack of such demand is not the problem here. The Plaintiff is simply suing to recover for himself on claims that belong to the corporation.

Plaintiff insists he is entitled to maintain an action in his own name for his proportionate share as a stockholder of damages caused by Defendant's wrongful conduct because CFMC is a dissolved corporation. (Pl.'s Response in Opposition to Def.'s Proposed Findings of Fact and Conclusions of Law 22) In support of that argument, Plaintiff cites an Opinion from an Illinois Appellate Court, *Hamilton v. Conley*, 827 N.E.2d 949, 958–59 (Ill. App. 2005). In that case, an aggrieved shareholder was permitted to sue in his individual capacity against a former director of

a dissolved corporation for conduct that occurred after the corporation was dissolved. *Id.* at 956. However, the reasoning in *Hamilton* does not support the Plaintiff's contention here. It held that the shareholder's right to sue arose from an Illinois statute providing for a five-year period within which a dissolved corporation must wind up its affairs. *Id.* at 958 (citing 805 ILCS 5/12.80. *Hamilton* explained that, "[a]t the end of that five-year period, and subject to the rights of creditors, a corporation's assets devolve, by operation of law, to its shareholders. Once that occurs, the shareholders of the corporation may bring the corporation's causes of action just as they may dispose of any other asset to which they have succeeded as owners." *Id.* The Plaintiff in *Hamilton* brought his action *after* that five-year period expired. *Id.* Here, the parties have stipulated that CFMC was dissolved on November 13, 2009. (Stip. ¶ 6) As five years have not passed since that time, Plaintiff brought this cause of action in his own name before Illinois law permits.

### Alleged Embezzlement of Corporate Assets

Plaintiff contends that Defendant appropriated company funds for his own benefit. (Pl.'s Proposed Conclusions ¶¶ 25, 28, 31) Plaintiff apparently refers to his following Proposed Findings of Fact: "Cheeks used the assets of CFMC to pay the expenses of other companies which he owned in whole or in part or which he was employed by and received a salary, including rent, telephone service, office furniture, office equipment, computers and technical support, payroll, utilities and insurance," (*Id.* at ¶ 41; *see also Id.* at ¶¶ 42–47, 55); "Cheeks took out hundreds of thousands of dollars in loans in the name of CFMC and then transferred those loan proceeds to his other companies, including to DKL," (*Id.* at ¶ 50; *see also Id.* at ¶ 51); "Cheeks used CFMC assets to purchase in excess of $25,000 in tickets from the Chicago Bulls, to buy a plasma TV for his office, to pay for DISH satellite service for his office, and to pay the lease payments on his luxury BMW automobile," (*Id.* at ¶ 56; Pl.'s Ex. 50); "[A] Legal Agreement [signed by Cheeks and made between CFMC and CBI] was used as a means to divert assets from CFMC to CBI and then, in turn, to Cheeks, his family and friends," (*Id.* at ¶ 65); "Cheeks used his position as an officer for CFMC and CBI and the accountant for CFMC and CBI to misappropriate approximately $934, 461 from CFMC for his own benefit and for the benefit of related companies, friends and family members, not including indirect benefits for the payment of expenses of the operations of Black Rhino, DKL d/b/a Blues, The Shire Group and Houston-Rogers Consulting," (*Id.* at ¶ 105; *see also Id.* at ¶ 106); and "Cheeks personally

received between $750,000 and $1,000,000 as a result of his misappropriation of assets." (*Id.* at ¶ 108) Those assertions all allege harm caused to the company.

There is no question that corporate directors may not use their positions to deal with or administer corporate property for their own personal gain or for the benefit of another person. *Poliquin v. Sapp*, 390 N.E.2d 974, 977 (Ill. App. 1979). Illinois law is clear, however, that the duty of directors to manage corporate business solely for the benefit of the corporation is owed to the corporation. *Id.* Any breach of this duty results in injury to the corporation and the shareholders a whole. *Id.*

Moreover, a Panel of the Seventh Circuit Court of Appeals has explicitly declined to formulate a special rule for closely held corporations such as CFMC. *Frank v. Hadesman & Frank, Inc.*, 83 F.3d 158 (7th Cir. 1996). In a case with facts similar to those here ostensibly alleging harm to the corporation, it was ruled in *Frank* that the case should have been brought as a derivative action by a corporation controlled by only two named shareholders where one shareholder sought to sue the other shareholder for transferring corporate assets to a new firm. *Id.* at 159, 161. *Frank* relied on an Illinois Appellate Court decision that had considered but rejected the possibility of allowing minority shareholders the right to bring a direct action against co-shareholders when the corporation is closely held. *Small v. Sussman*, 713 N.E.2d 1216 (Ill. App. 1999). That Illinois Appellate Court ruling, in light of its use in *Frank*, is the best predictor of what decision on this point would likely be made by the Illinois Supreme Court if the issue was presented there. *Frank*, 83 F.3d at 161.

Illinois law does provide one exception to the general rule regarding derivative actions. In at least one case, an Illinois Appellate Court permitted suit where the alleged wrongful acts were not committed only against the corporation but also were violations of a duty owed directly to the shareholder. *Zokoych v. Spalding*, 344 N.E. 2d 805, 813 (Ill. App. 1976). In this case, Plaintiff maintains that he has a personal claim against Defendant created by the "Shareholders' Agreement" made "between" Hulbert and Cheeks. (Pl.'s Resp. To Def.'s Proposed Findings of Fact and Conclusions of Law 21; Def.'s Ex. 13) He argues that the Agreement created a personal cause of action by the individual signatories to it against each other in event of a breach because it provided:

> Each of the parties to this Agreement shall be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable

attorney=s [sic] fees caused by any breach of any provision of this Agreement,
and to exercise all other rights existing in its [sic] favor.

(Pl.'s Resp. To Def.'s Proposed Findings of Fact and Conclusions of Law 21; Def.'s Ex.
13 ¶ 14.d(d))

Plaintiff's interpretation of the Shareholder's Agreement to grant him a personal
cause of action is without merit. First, the Shareholder's Agreement was made "by and
among Chicagoland Foods Military Consortium, Inc., Darryl Cheeks and Mark Hulbert
and the Class B Shareholders." (Def.'s Ex. 13, title page) The identities of Class B
shareholders are not defined in the Agreement and evidence was not presented during
trial showing that Hulbert and Cheeks comprised the entirety of this class of shareholders.
Defendant's Exhibit 11 specifically identified the identities of Class B Shareholders as of
April 5, 2007. (Def. Ex. 11) Plaintiff and Defendant actually signed the document, not in
their individual capacities, but as Class A Shareholders. (Def. Ex. 13, at ¶ 21)

Plaintiff tries to evade the requirement that harms to the corporation be addressed
through derivative actions by arguing that the language quoted above created a private
right of action against breaching signatories. The Agreement, however, contemplates a
dissatisfied party's option to bring an action to enforce whatever "rights" that "it" may
have even if "it" in the Agreement included individuals under Illinois law, those rights
comprised the ability to bring an action for harm to the corporation on by derivative
action.

Plaintiff argues that he was personally injured by Defendant's actions that
allegedly breached the following provision within the Agreement:

> The Parties to this Agreement agree to act in the best interest of *the Corporation*
> and in accordance with the terms of the Agreement. Further, the parties agree to
> refrain from engaging in any activity or conduct that would be unlawful or in any
> manner compromise the integrity and reputation of *the Corporation* or any of the
> shareholders. (emphasis added)

(Pl.'s Resp. To Def.'s Proposed Findings of Fact and Conclusions of Law 21; Def.'s Ex. 13
¶ 24.1) As this provision clearly indicated, any harm suffered by breach of the Agreement was to
the corporation and its shareholders as whole.

Even if Plaintiff felt the harm against the corporation more acutely than other
shareholders, that would not change the legal status of that harm. *Ching v. Porada*, 560 F. Supp.
2d 675, 679 (N.D. Ill. 2008). Plaintiff relied on an expert report by John Shoults that estimated

the financial damage assertedly suffered by Plaintiff as a result of Defendant's alleged misdeeds. (Pl.'s Ex. 1) That report detailed, among other things, monetary transfers between Cheeks' several businesses, loans and distributions made with CFMC funds to the friends and family of Cheeks, and dilution of Plaintiff's ownership interest in CFMC. (*Id.*) Each of these transgressions, if proven, harmed all CFMC shareholders proportionately to their percentage of shares owned. Due to Plaintiff's large ownership interest of stock (estimated at between 30 to 50%) the proportionate loss to his stock value was greater than that of other shareholders. However, the fact that he was disproportionately harmed by Cheeks' alleged actions does not support his argument that he can litigate individually.

An argument to that effect was rejected by a Panel of the Seventh Circuit in *Frank v. Hadesman*, 83 F.3d 158, 160 (7th Cir. 1996). In that case, one principal shareholder diverted a corporation's business to a new venture to the exclusion of the other principal shareholder. *Id.* at 159. The disappointed shareholder brought suit in his individual capacity complaining of the transfer of the corporation's business. *Id.* The Opinion in *Frank* questioned whether the plaintiff was the correct party in interest to bring the suit as the harm alleged was to the corporation and all shareholders. *Id.* As there were only two shareholders of the corporation, the plaintiff and defendant, the plaintiff sought to distinguish his case. *Id.* at 160–61. He argued that he had suffered a disproportionate harm because he was the net loser in the situation because any loss the defendant suffered as a result of the corporation's loss of business was recouped through the defendant's new venture. *Id.* at 160. The Opinion disagreed that the disproportionate harm suffered by the plaintiff entitled him to litigate individually. *Id.* It declined to establish any sort of test to determine when a shareholder may sue individually dependent on whether the shareholder alleges unique harm. *Id.* at 160.

Therefore, Hulbert cannot successfully argue here that he has been uniquely harmed in this case by Defendant's mis-handling of corporate assets because he has been harmed more than other CFMC shareholders.

## II.    ALLEGED LOSS OF PLAINTIFF'S CLAIM TO A "RETIREMENT ACCOUNT" IN THE DEFERRED COMPENSATION TRUST

Plaintiff separately argues that he proved a distinct injury to himself that differs from harm to the corporation. In particular, he claims to have suffered a distinct personal injury through loss of a "retirement account" that he assertedly owned personally in the amount of $125,000. (Pl's Proposed Conclusions ¶¶ 29, 32) This is a thornier question. Before Plaintiff can

13

show that he was injured by the loss of funds in the account in issue he must first show that he
had a personal ownership right or interest in it. Plaintiff maintains he had an interest in account
funds because a portion of the money in the account belonged to him personally. (*Id.* at ¶ 29)

However, the account in question (Pl.'s Ex. 16) was not a retirement account owned by
Plaintiff. Rather, it was a "Deferred Compensation Trust" account ("Trust" or "Trust account")
created in the names of Cheeks and Hulbert pursuant to a "Deferred Compensation Agreement"
between Chicagoland Foods, Inc. and Plaintiff.[1] (Pl.'s Ex. 14, 15) The Trust account is an
account bearing the names of Plaintiff and Defendant at James Asset Advisory, LLC, that
managed the account. (Pl.'s Ex. 16) The existence of the Trust account was established at trial
with Plaintiff's Exhibits 15 and 16. Exhibit 15 is a copy of two checks drawn from CFMC and
payable to James Asset Advisory, LLC, each in the amount of $150,000. Exhibit 16 is a
"consolidated account statement" for a "Non Qualified Deferred Compensation Trust." (Pl.'s Ex.
16) The "Deferred Compensation Agreement" is a separate document signed by Plaintiff and
Defendant that outlines rights and responsibilities of parties to that Agreement. (Pl.'s Ex. 14) The
parties to the Deferred Compensation Agreement were, as indicated by signature block on the
document, Chicagoland Foods, Inc. and employee Mark Hulbert. (*Id.*) The litigants did not
dispute authenticity of the Deferred Compensation Agreement or related documents so it is
proper to rely on the unambiguous provisions therein to determine Plaintiff's interest, if any, in
the Trust account.

Plaintiff was entitled under the Deferred Compensation Agreement to an amount equal to
the aggregate amount contributed by CFMC as stated in the agreement divided by (240) two
hundred forty. (Pl.'s Ex. 14 ¶ 1(C)) Plaintiff's termination was to have no effect on his right to
receive payment pursuant to the Deferred Compensation Agreement. (*Id.* ¶ 2) In late 2006 and
early 2007, the Trust account was liquidated and two checks were issued from the "Chicagoland
Foods, Inc. Trust - Deferred Compensation Plan (James Asset Advisory, LLC as Trustee)," *i.e.*,
the Trust account, each in the amount of $125,000, made out to "Chicagoland Foods Inc." (Pl.'s
Ex. 19) The Trust thereby loaned to "Chicagoland Foods, Inc." the total sum of $250,000 in
return for a promissory note made in November 2006. (Pl.'s Ex. 20)

---

[3] Plaintiff's evidence did not explain his supposed employment relationship, if any, with
"Chicagoland Foods, Inc."

A deferred compensation plan "is an agreement by the employer to pay compensation to employees at a future date." *IT Group, Inc. v. IT Litigation Trust*, 448 F.3d 661, 664 (3d Cir. 2006). These plans are often intended to defer receipt of compensation until the employee's retirement, when the employee may be in a lower tax bracket, to reduce the amount of tax paid. *Id.* The terms of this Deferred Compensation Agreement must be analyzed to determine whether Plaintiff in fact had a personal interest in Trust account funds the loss of which resulted in a distinct personal injury. This analysis necessarily also considers the legal landscape that controls deferred compensation plans.

### a. Application of ERISA

In this case, Plaintiff's claim of right to funds in the Trust account hinges on application of the Employee Income Retirement Security Act of 1974 ("ERISA" or "Act"). 29 U.S.C. §§ 1101 *et seq.* The issue under ERISA is whether funds in the Trust account belonged to the Plaintiff, or whether they belonged to the corporation, CFMC. In bankruptcy, certain types of deferred compensation plans, and the funds tied to them, are treated as property of the employer's bankruptcy estate. *IT Group, Inc. v. IT Corp.*, 305 B.R. 402, 407 (Bankr. D. Del. 2004). Other plans, however, are treated as trusts in which plan beneficiaries have a personal interest in. *Id.*; *see also Patterson v. Shumate*, 504 U.S. 753, 759–60 (1992). Thus, it must first be determined whether funds in the Trust account created by CFMC were an asset of the company or if the account was a trust for Plaintiff's benefit.

ERISA is generally viewed as "a comprehensive statute that subjects a wide variety of employee benefit plans to complex and far-reaching rules designed to protect the integrity of those plans and the expectations of their participants and beneficiaries." *Duggan v. Hobbs*, 993 F.3d 307, 310 (9th Cir. 1996). Included among those rules are provisions governing plan participation, vesting, and funding of deferred compensation plans. *See* 29 U.S.C. §§ 1051(2), 10841(a)(3), 1101(a)(1). ERISA also imposes fiduciary duties for plan managers. § 1104. Some plans, however, are excepted from ERISA's substantive provisions. A plan falls within the exception if it "is unfunded and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." § 1101(a)(1). These plans, also known as "top hat" plans, are still subject to ERISA's reporting and disclosure provisions in addition to the Act's administration and enforcement provisions. 29 U.S.C. §§ 1021–31, 1131–45.

When a deferred compensation plan qualifies as a "top hat" plan under ERISA, that plan is treated as property of the obligor-corporation. This issue has arisen in bankruptcy cases. In each case where it was determined a deferred compensation plan was a "top hat" plan, it was concluded that any funds in trust accounts created pursuant to the plan were property of the debtor-corporation that created the accounts. *E.g.*, *Korneff v. Downey Reg'l Med. Ctr.-Hosp., Inc.*, 441 B.R. 120, 129–131 (B.A.P. 9th Cir. 2010); *In re Colonial Bankgroup, Inc.*, 436 B.R. 695, 713 (Bankr. M.D. Ala. 2010); *Schroeder v. New Century Holdings, Inc.*, 387 B.R. 95, 114 (Bankr. D. Del. 2008).

**b. The Deferred Compensation Trust was "Unfunded."**

ERISA does not define "unfunded" nor has Seventh Circuit precedent interpreted the phrase. Other Circuit Courts of Appeal have ruled on the issue, however. *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208 (8th Cir. 1981); *Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283 (2s Cir. 2000); *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505 (5th Cir. 2002); *IT Group, Inc. v. IT Litigation Trust*, 448 F.3d 661 (3d Cir. 2006). In determining whether a plan is "unfunded" for ERISA purposes, those opinions have focused on two closely related questions. First, whether the corporation separated funds from its general assets to pay plan benefits. *IT Group, Inc.*, 448 F.3d, at 667. Second, whether plan beneficiaries have a legal right greater than that of a general unsecured creditor to the corporation's assets. *Id.* Essentially, the central inquiry is whether the deferred compensation plan assets are segregated from the general assets of the company so that they are not available to the company's general creditors in the event of bankruptcy or insolvency. *Id.*; *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208 (8th Cir. 1981) (finding a benefit plan was "funded" because the plan documents stated that the employer had secured its obligations by purchasing life insurance and had not reserved its rights to treat the policies as general unrestricted assets). *Cf. Belsky v. First Nat'l Life Ins. Co.*, 818 F.2d 661 (8th Cir. 1987) (distinguishing *Dependahl* on the basis that the employer reserved its right to use the policies as general assets). An Eighth Circuit Opinion stated, "[f]unding implies the existence of a res separate from the ordinary assets of the corporation." *Dependahl*, 653 F.2d at 1214. This means the employee can look to a *res* separate from the corporation in the event a contingency occurs that triggers liability of the plan. *Id.*

In this case, the Deferred Compensation Agreement tracks the ERISA requirement that a "top hat" plan be "unfunded." That document clearly states that the plan was to "be unfunded for

tax purposes and for purposes of Title I of ERISA." (Pl.'s Ex. 14 ¶ 6) Furthermore, the relevant

portion of the Deferred Compensation Agreement stipulated:

> 7. <u>Status of Payments</u>. Nothing contained in this Agreement and no action taken
> pursuant to the provisions of this Agreement shall create or be construed to create
> a trust of any kind, or a fiduciary relationship between the Company and the
> employee . . . . To the extent that a person acquires the right to receive Monthly
> Benefit Payments from the Company under this Agreement, such rights shall be
> no greater than the right of any unsecured creditors of the Company. This
> Agreement constitutes a mere promise by the Company to make benefit payments
> in the future.

(*Id.* ¶ 7) Therefore, the Deferred Compensation Agreement therefore did not by its terms provide

Defendant with any rights greater than that of a general unsecured creditor of the corporation.

Plaintiff could argue that the funds in this case were separated from the general

assets of CFMC. Indeed, as described previously. Plaintiff submitted evidence of the

existence of a Trust account in his name held with James Asset Advisory, LLC. (Pl.'s Ex.

14) Two checks for $100,000 each were paid from the account of CFMC to James Asset

Advisory, LLC. (Pl.'s Ex. 15) One check, dated December 23, 2006, contained the phrase

"Non-qualified Defeered [sic] Compensation Trust Contribution for M Hulbert" in the

memo line. (*Id.*) The other check, also dated December 23, 2006, contained the phrase

"Non-qualified Defeered [sic] Compensation Trust Contribution for D Cheeks" in the

memo line. (*Id.*) Another document, dated June 6, 2006, was labeled "Non Qualified

Deferred Compensation Trust." (*Id.*) This is a consolidated account statement addressed

to Chicago Land Foods, Inc.[2] and created by James Asset Advisory, LLC. (Pl.'s Ex. 16)

The existence of that Trust account is not dispositive, however. As explained by a

Panel of the Third Circuit, "An employer may set aside deferred compensation amounts

in a segregated fund or trust without jeopardizing a plan's 'unfunded' status if the fund or

trust remains 'subject to the claims of the employer's creditors in the event of insolvency

or bankruptcy." *IT Group, Inc. v. IT Litigation Trust*, 448 F.3d 661, 665 (3d Cir. 2006)

(quoting David J. Cartano, *Taxation of Compensation & Benefits* § 20.05[D], at 731

(2004)). The most common mechanism used by employers to set aside funds to pay

---

[2] The documents create some confusion as to the identity of the account holder. For example, the consolidated
account statement is addressed to "Chicago Land Foods, Inc." (Pl.'s Ex. 16) Yet, the Deferred Compensation
Agreement is made between CFMC and Hulbert. (Pl.'s Ex. 14) Funds deposited to open the account with James
Asset Advisory, LLC were paid from CFMC. (Pl.'s Ex. 15) Funds paid out of the account were made out to
"Chicago Land Foods, Inc" but were paid to the CFMC's bank account. (Pl.s Ex. 19)

deferred compensation is the "rabbi trust."[3] *IT Group, Inc. v. IT Litigation Trust*, 448

F.3d at 665. This type of trust is "an irrevocable trust for deferred compensation. Funds

held by the trust are out of reach of the employer, but are subject to the claims of the

employer's creditors in the event of bankruptcy or insolvency." In this case, the Deferred

Compensation Agreement provided:

> Any trust created by the Company and any assets held by the trust to assist it in
> meeting its obligations hereunder will conform to the terms of the model trust
> described in Revenue Procedure 92-64.

(Pl.'s Ex. 14 ¶ 6) The model trust described in Revenue Procedure 92-64 is now

commonly referred to as a "rabbi trust" in that procedure. Rev. Proc. 92-64. A so-called

"rabbi trust" is not explicitly necessary to preserve "top hat" status. What is required is

that the funds be accessible to the employer's creditors. *Id.*

Plaintiff submitted no evidence as what terms governed implementation of the

Trust account. The Deferred Compensation Agreement, as stated in the preceding

paragraph, intended that any trust created pursuant to it would be a "rabbi trust." Yet, it

appears that the Trust account in this case may have not complied with the terms called

for under Revenue Procedure 92-64 because funds in the Trust account evidently were

within the reach of Defendant as he was able to liquidate the Trust account. Because

Plaintiff submitted no evidence showing the Trust account did not qualify as a "rabbi

trust" it cannot be conclusively determined whether the Trust in this case was a "rabbi

trust" or a true trust at all.

Plaintiff submitted evidence of several pre-litigation attempts to obtain

documentation related to the deferred compensation plan in the form of letters from

Plaintiff's counsel to Defendant's counsel. (Pl.'s Ex. 22–25)  Perhaps any documents

obtained by Plaintiff would have established that the Trust was created for the benefit of

Plaintiff and that funds in it were not available to CFMC creditors. However, Plaintiff has

not shown that any available documents establish any interest by Plaintiff in the Trust

account funds.

### c. Tax Consequences of the Trust

---

[3] These trusts became known as "rabbi trusts" following an Internal Revenue Service letter ruling on a trust for the
benefit of a certain rabbi addressing the tax treatment of the trust in question. *Bank of Am., N.A. v. Moglia*, 330 F.3d
942, 944 (7th Cir. 2003).

Even if it could be argued that Trust funds in this case were segregated from CFMC's general assets, Plaintiff still could not establish any proprietary interest in the Trust's funds because Plaintiff did not treat the funds as his property for tax purposes. Determination of the "funded" or "unfunded" status of a deferred compensation plan requires an examination of the surrounding facts and circumstances, including its status under non-ERISA law. *IT Group, Inc.*, 305 B.R. at 407. Several courts to have considered the issue found it appropriate to consider the tax consequences of the deferred compensation plan at issue. *See, e.g.*, *IT Group, Inc.*, 448 F.3d 661, 668–69 (3d Cir. 2006); *Reliable Home Health Care, Inc. v. Union Central Ins. Co.*, 295 F.3d 505 (5th Cir. 2002). The Fifth Circuit Opinion quoted a holding by a District Court Judge in that Circuit, stating, "a 'plan is more likely than not to be regarded as unfunded if the beneficiaries under the plan do not incur tax liability during the year that the contributions to the plan are made.'" *Reliable Home Health Care, Inc.*, 295 F.3d at 514. The rationale for this test looks to basic tax rules. In general, when an employer exchanges assets with an employee in return for services, any assets received by the employee are taxed as income to the employee. *Schroeder v. New Century Holdings, Inc.*, 387 B.R. 95, 109 (Bankr. D. Del. 2008). However, simultaneous exchange of services for compensation is not required for taxation purposes. *Id.* When compensation is made available to an employee without substantial restrictions on the employee's control over the funds, the employee is deemed to have constructively received those funds and must include their value in gross income calculations. *Id.* Deferred compensation plans get around this rule if they are "unfunded." *Id.* With "unfunded" plans, the employee is not taxed on the compensation until she or he actually receives the deferred amount because "the employee may never receive the money if the company becomes insolvent." *IT Group, Inc.*, 448 F.3d 661, 665 (3d Cir. 2006). This is because the funds are available to the creditors of the company.

In this case, Plaintiff introduced no evidence that he paid taxes on funds in the Trust account. This is at odds with Plaintiff's contention of his proprietary interest in those funds. However, this is quite consistent with the conclusion that funds in that account were property of CFMC, not of the Plaintiff.

### d. The Deferred Compensation Trust was Maintained Primarily for a Select Management Group.

Further supporting a finding that the Trust and Deferred Compensation Agreement in this case comprises a "top hat" plan is that the plan was apparently created only for a select group of CFMC management. Plaintiff's evidence as to the Trust account held with James Asset Advisory, LLC shows only accounts in the name of Hulbert and Cheeks, the two directors of CFMC. No evidence was supplied showing that deferred compensation agreements or accounts were made in the names of other CFMC employees. Therefore, the second requirement for "top hat" status is met in this case, indicating any funds in the Trust account belonged to CFMC, not to Plaintiff individually.

### e. Funds in the Deferred Compensation Trust were Property of CFMC

As stated previously, Plaintiff did not dispute authenticity of the documents establishing the Deferred Compensation Agreement and Trust account and each was admitted into evidence. (Pl.'s Ex. 14, 15, 16) Plaintiff similarly did not dispute the terms in plan documents. It is therefore appropriate to rely on the unambiguous provisions of the plan to determine whether Plaintiff owned an interest in the account funds. *Korneff v. Downey Reg'l Med. Ctr.-Hosp.*, 441 B.R. 120, 129–30 (9th Cir. B.A.P. 2010). Under Illinois law, "[t]he terms of an agreement, if not ambiguous should be generally enforced as they appear, and those terms will control the rights of the parties." *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 368 (1998). No ambiguity has been argued in this case. The Deferred Compensation Agreement plainly states that compensation deferred under the plan would not be held in trust for Plaintiff. (Pl.'s Ex. 14 ¶ 7) That document provides: "Nothing contained in this Agreement and no action taken pursuant to the terms of this Agreement shall create or be construed to create a trust of any kind . . . between the company and the employee." (*Id.*); *see also Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283 (2d Cir. 2000) (construing a provision similar to that in this case and stating, "[t]he terms of the Plan plainly do not give plaintiffs a greater legal right to the funds in the Deferred Compensation Liability Account than that possessed by an unsecured creditor.") In addition, the Trust account held with James Asset Advisory, LLC was held in the company name. Therefore, the Trust account and Deferred Compensation Agreement created a "top hat" plan and any obligations owed to Plaintiff were purely contractual and due from CFMC, not the defendant Cheeks. *See Korneff*, 441 B.R. at 130.

## CONCLUSION

Plaintiff has not established any distinct personal injury, and he may not sue Defendant for harms done to CFMC. Rather, Plaintiff's assertions that Defendant breached his fiduciary duty to CFMC and misappropriated corporate assets pleaded injuries to the corporation that could only be remedied through a shareholder derivative action. Therefore, Plaintiff in this adversary is not the real party in interest for any of the wrongs against the corporation that were asserted. To assert them, he should have sued in derivative capacity, joining the corporation for whose benefit the action could have been brought. Further, the Deferred Compensation Agreement and the account created pursuant to it did not create a personal right of Plaintiff in moneys deposited into the account.

Since Plaintiff cannot show any distinct personal injury and did not sue in a derivative capacity, whether the corporation was harmed or not is moot and issues under 11 U.S.C. § 523 are likewise moot. Judgment will separately enter for Defendant.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 7th day of March, 2012.

## CERTIFICATE OF SERVICE

I, Dorothy Clay certify that on March 7, 2012, I caused to be served copies of the foregoing

Findings of Fact and Conclusions of Law to the following by electronic service through the Court's

CM/ECF system or regular U.S. mail:

Secretary/Deputy Clerk

### Electronic Service through CM/ECF System

**Kevin P McJessy**
McJessy Ching & Thompson LLC
3759 N Ravenswood, Ste 231
Chicago, IL 60613
Counsel for Plaintiff

**Aaron C Smith**
Locke Lord Bissell & Liddell, LLP
111 South Wacker Drive
Chicago, IL 60606
Counsel for Plaintiff

**Thomas M Hartwell, ESQ**
929 N Lafox Street
South Elgin, IL 60177
Counsel for Defendant